

RECEIVED
Mail Room

MAR - 4 2025

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

# United States Federal District Court of the District of Columbia

## Washington, DC

Marta Lyall, Plaintiff

V

United States Department of Justice (DOJ), via U.S. Attorney's Office for the District of Western Washington.

Chief Judge Honorable David G. Estudillo for the U.S. District Court for the Western District of Washington, in individual and official capacities.

JOHN DOE DEFENDANTS 1-5, in their individual capacities,

JANE DOE DEFENDANTS 1-3, in their individual capacities,

Defendants

Case: 1:25–cv–00644    JURY DEMAND
Assigned To : McFadden, Trevor N.
Assign. Date : 3/4/2025
Description: Pro Se Gen. Civ. (F–DECK)

**COMPLAINT**

<u>JURY TRIAL DEMAND</u>

## INTRODUCTION

1. Plaintiff brings this action against the United States Department of Justice (United States Department of Justice (DOJ), via U.S. Attorney's Office for the District of Western Washington),

Chief Judge Honorable David G. Estudillo for the U.S. District Court for the Western District of

Washington, in individual and official capacities and unidentified federal actors (John Doe and Jane Doe Defendants) for a decades-long conspiracy of retaliation, sparked by her father's 1975 sudden and unexpected death while he researched an apparent military-CIA scheme recruiting youths in poverty from California, as mercenaries and patsies. The retaliation against his daughter (Plaintiff), escalated into a modern "virtual prison" of financial, professional, and physical suppression—all constituting cruel and unusual punishment under the Eighth Amendment through the unlawful use of technology platforms designed for the use of law enforcement, not the suppression of the rights of US citizens.

**JURISDICTION AND VENUE**

2. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346 (United States as defendant), as this case arises under the U.S. Constitution (Eighth, Fifth, First Amendments) and federal statutes (e.g., 5 U.S.C. § 552, 42 U.S.C. § 1985, civil obstruction of justice, including conduct that violates 18 U.S.C. § 1503 when viewed through an actionable civil framework). Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendant DOJ resides in this district, and a substantial part of the conspiracy's direction emanates from here.

**PARTIES**

3. Plaintiff Marta Lyall, is a resident of Washington state, targeted since 1975 for her father's journalism and her efforts to defend herself from federal misconduct.

4. United States Department of Justice (DOJ), via U.S. Attorney's Office for the District of Western Washington, including the US Trustee's office in Western District of Washington.

5. Chief Judge Honorable David G. Estudillo for the U.S. District Court for the Western District of Washington, in individual and official capacities – Individually liable under Bivens for allowing the coordinating of Federal Judges in this district to violate the rights of Plaintiff, including Federal Bankruptcy Court Judges, Clerks, and Deputy Clerks, State Court Judges, Magistrates, clerks, and staff in King County Superior court, causing financial and physical harm to Plaintiff, intentional

obstruction of official court proceedings, signed court orders, tampering with court docket, false case labeling to cause false narrative and reputational harm and other causes of actions. Officially named for injunctive relief.

6. Defendants John Doe 1-5  and Jane Doe 1-3 are unidentified federal officials, judicial actors, and private individuals acting under DOJ direction, sued in their individual capacities for constitutional violations under Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971), and other causes of actions as they are identified.

## CLAIMS for Relief

### First Cause of Action – Bivens Claim for Damages

(Against Chief Judge David G. Estudillo and John Doe 1-5  and Jane Doe 1-3 in their Individual Capacities)

1. Plaintiff brings this claim pursuant to Bivens v. Six Unknown Named Agents, alleging that Chief Judge David G. Estudillo and unknown defendants (John Doe 1-5  and Jane Doe 1-3) engaged in unconstitutional conduct, violating Plaintiff's rights under the Fifth Amendment Due Process Clause.

2. Defendants' unlawful actions—including but not limited to suppression of filings, intimidation, ignoring Supremacy Clause, and writing orders which include sarcasm, mocking of laws, and gaslighting as procedure and laws were exploited or ignored, coordinated mis-labeling of state case status, and of federal case titles to mislead public about Plaintiff, allowing fraud in financial proceedings, refused to adjudicate evidence presented by Plaintiff and instructed staff and clerks office to assist, resulting in financial losses to Plaintiff but illegal gains to other parties and other procedural irregularities—caused direct and quantifiable physical, financial harm and intentionally caused lost of professional and personal reputation to Plaintiff.

3. Plaintiff reserves the right to amend this claim as discovery identifies additional defendants responsible for these violations.

4. As a result of Defendants' conduct, Plaintiff seeks compensatory and punitive damages in an amount to be determined at trial.

**Second Cause of Action – Injunctive and Declaritory Relief**

(Against All Defendants in their Official Capacities)


5. Plaintiff seeks injunctive relief to halt ongoing unconstitutional and unlawful conduct by Defendants, including but not limited to intimidation, suppression of legal filings, and the intentional misrepresentation of case status, tampering with docket, directing deputy clerks to mislead plaintiff in order to impede her access to due process in court proceedings, gaslighting on procedure and dates to cause default or harm, illegally removing restraints on and not processing to Law enforcement, a signed Temporary Protection Order, resulting in physical harm of Plaintiff, her dog and Plaintiff's Property. Knowingly facilitating a fraudulent title transfer, receiving from Plaintiff over $89,000 in plan payments in a Chapter 13 case, without paying creditors or returning funds to Plaintiff, financially suppressing Plaintiff, by coordinating the removal of all positive trade lines from her credit record, while fraudulently increasing federal student loan balance by 200%, interfering with her phone service and misdirecting calls, so lawyers are unreachable, interfering with Federal Social Security retirement benefits, fraudulently interfering with banking, lending and insurance, and exploiting the IRS, to create false debts on Plaintiff's IRS account.

6. Defendants' actions continue to chill Plaintiff's legal rights, interfere with due process, and obstruct lawful proceedings.

7. Plaintiff requests that the Court issue an injunction directing Defendants to cease such conduct immediately, including an order by the U.S. Attorney General, or other appropriate federal authority, ensuring compliance.

8. Plaintiff seems returning monies not paid to creditors, in 2013 Chapter 13 case; Reutrn of Title of her home, fraudulently transferred in 2023 and 2024, (multiple dates are provided to obscure the

actual date), and other relief as actions are clarified through discovery. Plaintiff seeks injunctive and declaratory relief to prevent further harm.

**Third Cause of Action – Civil Obstruction of Justice**

(Against All Defendants in Individual and Official Capacities)

9. Plaintiff alleges that Defendants' actions constitute civil obstruction of justice, including conduct that violates 18 U.S.C. § 1503 when viewed through an actionable civil framework.

10. Defendants' acts—including suppression of legal documents, procedural interference, and coordinated intimidation—obstructed justice and directly resulted in financial loss to Plaintiff.

11. As a result of Defendants' obstruction, Plaintiff seeks damages to compensate for the monetary harm caused, in an amount to be determined at trial.

**Fourth Cause of Action: Violation of the Eighth Amendment (Cruel and Unusual Punishment)**

12. Defendants' created "virtual prison" through the abuse of law enforcement's technology platforms, and physical attacks, which intensified after Plaintiff submitted a 2019 fax reporting to US Attorney in Western Washington new evidence (which emerged through research based on her father's work), in the murder of a US Border Agent, and after filing evidence of the collusion and illegal acts identified through emails, by the DOJ Bankruptcy Trustee and Federal Judge in 2013 and 2019 Bankruptcy cases, resulting in an escalation of harmful acts, constituting cruel and unusual punishment without conviction, violating the Eighth Amendment.

**Fifth Cause of Action: 42 U.S.C. § 1983 Claims, and Obstruction of Justice**

13. **First Amendment Retaliation (1975-Present):** Retaliation for Plaintiff's father's speech and her continuation of his research.

14. **Fifth/Fourteenth Amendment Due Process (1995-2000):** CMU's failure to address harassment and violent porn, torture technology creation environment.

15. **Fifth/Fourteenth Amendment Due Process (2015):** Federal judge's dismissal of 2013 bankruptcy case ignoring trustee fraud on Proof of claim; not paying Lender $89,000 of payments made by Plaintiff and not returning payments as required by law; Causing car loan to fail, when it was in perfect standing on entering Chapter 13, causing repossession of car the day of Order to Dismiss case, showing Lender was informed of court to take this action. Emails between Plaintiffs Lawyer, Judge and Trustee to take these actions to harm Plaintiff and cause damage.

16. **Fifth/Fourteenth Amendment Due Process** (August 2019-2025): Fraudulent student loan manipulation by ED agents on 1986 Federal loan. Doubling balance, for no reason, increasing payments every month by 200%, while in forced forebearance, changing origination date, to make it look like it is 2001 instead of 1988. Ombudsman not responding for over a year to concerns. Removing all payments on ledger and reporting there were none to credit bureaus. Causing drop of credit score as this is the only loan bureaus report.

17. **Fifth/Fourteenth Amendment Due Process (June 2022-2025):** State court, Bankruptcy court, and federal court, County Assessor, and Allstate Insurance facilitation of fraudulent NOD and title theft.

18. **Fifth/Fourteenth Amendment Due Process (December 2023):** State court gutting of TPO restraints while Plaintiff not present, and not processing it, despite 2 attempted vehicular assaults in 2023, when ever Plaintiff attempted to file evidence in Bankruptcy case—evidence which was never adjudicated or heard on party filing proof of claim, who had no standing. And who in January 2025, listed himself as Servicer, when there is no mortgage, and the he listed himself as both purchaser of property at alleged auction which never occurred and now Servicer. Also in Edgar database, he lists himself as having a relationship with former Servicer and lender Bank of America, stating they are his record keepers. This is fraudulent.

19. **Fifth/Fourteenth Amendment Due Process (December 2024)**: Federal judge's improper remand ignoring 9th Circuit jurisdiction. Judge Whitehall, issued an Order to remand the removal of two state cases, when there was still a Petition for enhanc rehearing, in the 9th circuit, so he had no jurisdiction to do this, and he even stated he knew they had Jurisdiction. He then told Plaintiff in his responsive Order, to her Motion to Reconsider, that he is only reconsider if the 9th circuit told him to, when he know that was pending. So he was bypassing Jurisdiction to cause harm to plaintiff, Including facing an illegal eviction case, in state court which also had no jurisdiction, and could not be filed as there is an active case disputing the fraudulent title transfer.

20. **Eighth Amendment Cruel and Unusual Punishment** (1995-2025): See above, in Section on Eighth Amendment violation and Virtual Prison.

21. **Eighth Amendment Cruel and Unusual Punishment** (January 14, 2025): Heat-weapon injury post-TRO denial and pre-Show Cause hearing for eviction case, which is void, as jurisdiction is with the 9th circuit, and there is an active title dispute case. It appeared the effort was made hoping the Plaintiff would lose her life or be severely injured so court proceedings would not be able to continue, and since title had been illegally transferred, the officials and parties would just take the property and equity, since they had no legal standing to do so. When it was learned the Plaintiff had survived, the hearing notice was served, 20 days later, with wrong property address, party who was previously named as purchaser, at auction, was now listed as servicer, and same of court was unreadable. So clearly, they just intend to push through because they feel the rogue court actors will support the illegal behavior, ignoring their oaths, and the law. They act like mobsters.

22. **Fourteenth Amendment Equal Protection** (1995-2000): Discriminatory treatment at CMU tied to Plaintiff's dad's research.

23. **Fourteenth Amendment Equal Protection** (2022-2025): Social Security Administration fraud including complicit behavior by Senators Murray/Cantwell regarding Plaintiff's retirement benefit fraud.

24. **Fourth Amendment Unreasonable Seizure** (2022-2025): Ongoing eviction attempts and illegal transfer of title by county assessor, despite fraudulent title actions active in court.

## FACTUAL ALLEGATIONS

### A. Origin of Retaliation: Father's 1975 Death and Investigation

25. In 1975, Plaintiff's father, a Seattle Post-Intelligencer Managing Editor, died suspiciously at Doctor's Hospital (now Virginia Mason) at age 51 while investigating an incident occurring in Washington state—one of the first sniper incidents. A 23 YO man, (John Doe 1), reached out to Mr Richard Lewis Lyall, in a court room, and asked to speak to him. It was later learned the subject, John Doe 1, had been recruited for an apparent military-CIA scheme involving at least 31 vulnerable California boys in poverty, from youth correctional facilities to perform mercenary-type work, in the Vietnam war, and other locations including Guatemala.

26. Plaintiff's 2017 FOIA suit for FBI records on her father and herself yielded nothing despite known files, including multiple interviews they conducted with her in Pittsburgh PA, when she served as Tenure-Track faculty of Carnegie Mellon University, from 1995-2000. She also had obtained hundreds of documents from law enforcement FOIAs, including those naming her father, in the investigation of the subject, John Doe 1, including his original note to her father.

### B. Early Academic Retaliation (1994-2000)

27. In 1994, Plaintiff was invited to a prestigious computing event at Simon Fraser University (SFU), attended by esteemed faculty from Yale and Harvard. This opportunity, intended to advance her academic career and increase her knowledge of complex computer programming involving virtual world development. Instead it led her to apply for a fateful tenure-track position at Carnegie Mellon University. It has now become evident that her offer to join the faculty at CMU, may have occurred because she was targeted for retaliation linked to her father's controversial research.

### Timeline of Selected Events at CMU or CMU related.

28. In July 1995, a study on violent pornography was published, which referenced faculty within her department. This crude "study" was carried out by an undergrad, which never occurs. Yet it appeared in prominent outlets such as The New York Times, Time Magazine, and the George Washington Law School Journal.

29. The Plaintiff was never told about this before she accepted the position and only learned of it in 2023, using an LLM, (AI research tool). The study exposed a campus ecosystem producing and distributing 917,410 violent pornographic files (e.g., bestiality, pedophilia), downloaded 8.5 million times—yet from 1995 to 2000, CMU ignored Plaintiff's complaints about this impact on male CS and Robotic students and a student's rape. Brent Scott, was hired into her small department, for a temporary faculty position without credentials in August 1995, and openly developed violent pornography at the university and later sold technology he developed as subscriptions to torture women remotely.

30. Simultaneously, Epstein's presence at MIT (1995-2000) overlapped with CMU's unchecked predation—MIT tolerated Epstein's funding and influence despite his known sexual exploitation of young women, sourced partly through Les Wexner's Victoria's Secret networks, reflecting a parallel administrative indifference to sexual violence as a means to protect elite interests, including those tied to Plaintiff's father's 1975 research exposing military-CIA mercenary schemes involving underage boys.

31. In August 1995, when Plaintiff joined Carnegie Mellon University (CMU) as a tenure-track professor in experimental computing, she entered a department saturated with violent pornography, a hostile environment mirroring the sexual violence and exploitation concurrently festering at the Massachusetts Institute of Technology (MIT) during Jeffrey Epstein's orbit in the late 1990s—both enabled by administrative tolerance tied to broader networks of power and predation

32. In 1997, she received a threatening voicemail at her home at 2am, from a CMU graduate student warning her that she should be afraid. The Pittsburgh District Attorney's office prosecuted the case,

yet CMU did not respond, instead belittling the incident. During her visit to the DA's office, she observed that the office was filled with female CMU students reporting incidents of stalking and harassment, further highlighting the systemic issues within the university.

33. The harassment she experienced from 1995 to 2000 at CMU, combined with Brent Scott's unchecked activities, established a connection to her father's exposure of military abuses, as the same networks funding CMU's technological projects were implicated. Around 2000, Scott left CMU but continued to develop his technology into a subscription service where women could be tortured remotely for a fee. Over the next seven years, he earned $29,000 monthly from 35,000 subscriptions, ultimately selling the content to European buyers.

34. In **2009**, after she was back in Seattle, she became aware of Scott's activities after receiving a Valentine's Day death threat from a patsy/frontman, linked to a family with longstanding ties to CMU's funding. The plaintiff sought and was granted a civil Protection Order in effect from October 2010 to 2020. She suffered 150 violations of this Order, and Police in Washington state intimidated her, including coming to her home, placing a hand on a gun, and telling her to open the door to her bedroom where her dog was barking out of fear from the screaming coming from the officer, (a sergeant). He intimated he was going to shoot her dog. She refused to open the door. He told her again, to stop filing violations of the protection order, an activity she was instructed to do by the Judge who issued it.

35. This administrative complicity at CMU and MIT intertwined with a web of financial and operational ties involving Mark Cuban, Miriam Adelson, and Les Wexner, whose Victoria's Secret empire facilitated Epstein's predation—paralleling CMU's tolerance of Scott's violent tech and its military funding roots. The Valentine's Day 2009 death threat linked to CMU actors, while Cuban's business orbit intersected Adelson's wealth. Sheldon Adelson, the late husband of Miriam, had ties to Epstein via Wexner's Victoria's Secret.

36. In January 2011, the patsy/frontman who made the death threat, was extradited from New York City to Seattle, where he entered a criminal plea. During this period, Mark Cuban—born in Pittsburgh—and his brother, Brian Cuban, became involved. Brian Cuban, acting as the manager of Mark Cuban's foundation, targeted her with derogatory online smears and in private emails. This campaign was halted in 2012 when a Chief Judge in Washington State court issued an injunction order which stopped the smear campaign.

37. Despite the court order, the retaliation evolved into financial devastation and legal harassment ("Lawfare"), intensifying after 2014 when she resumed her father's research, (merely thinking she was carrying out her promise to him), uncovering deeper links between military intelligence agencies and child mercenary operations.

38. In **April 2021**, she began participating in online Zoom discussions with Cardano, (a blockchain company), to explore new forms of technological interface, immutability and governance using its technology. However, upon her arrival, CMU and Mark Cuban became involved with Cardano, reigniting the harassment. The sabotage mirrored the tactics used at CMU, including pornographic disruptions on screen during Cardano Zoom meetings she attended. After the community approved her proposal for research, in **September 2021**, she found herself blacklisted from contacting Cardano developers, replicating the professional isolation she had experienced at CMU. Additionally, the founder of Cardano, became the namesake of a School of Mathematics at Carnegie Mellon. He does not have an undergraduate degree. And there was no indication he was involved with CMU, until she joined Cardano discussions. It should be noted researchers from DARPA also attended the meetings.

39. Shortly afterward, in **September 2021**, she received an image of a dog resembling her own, shot in the right hind leg and carried away by a cloaked figure. It was directed to her by former military, who now was involved in pornographic image production at Cardano, who only arrived after Cuban

and CMU had a presence at Cardano. Within a month, her dog suffered an injury in the same area, followed by poisoning that caused seizures. Although detox treatments stopped the seizures, ongoing external injuries ultimately led to the dog's death on October 16, 2024. These targeted acts of harm reflected military tactics typically reserved for enemies in war, underscoring the severity and calculated nature of the retaliation campaign that had persisted for decades and had ties to government agencies.

C. **Physical Harm and Retaliation (2017-2025)**

40. Retaliation turned physical, including external injuries to her dog, two attempted vehicular assaults, two heat-weapon injuries to Plaintiff, attempted property damage, property insurance fraud, and illegal title transfer of her home at the state level, despite federal jurisdiction.

D. **Selected Financial Suppression (2019-2025)**

41. On September 1, 2024, Plaintiff visited a car dealership to explore purchasing a larger vehicle intended to expand her courier business and increase her earning capacity. During this visit, Plaintiff received an immediate credit approval and financing offer from the dealership. However, she declined the offer due to the high monthly payment and informed the sales staff before leaving.

42. On September 3, 2024, Plaintiff returned to the dealership to revisit the prior offer but was assisted by a different sales manager. Upon accessing Plaintiff's file, the sales manager observed that the lender's name and "approved" status were displayed. Plaintiff subsequently contacted the lender directly, who confirmed that they were awaiting vehicle details from the dealership, which had not been provided.

43. In February 2025, Plaintiff obtained her credit reports from Equifax, Experian, and TransUnion. These reports showed 19 hard inquiries dated September 1 and September 3, 2024, allegedly associated with her visits to the dealership, despite Plaintiff authorizing only one inquiry. As a result, Plaintiff's credit score dropped by 50 points, negatively impacting her financial standing. When questioned, dealership management appeared defensive and implied that external pressure had

compelled the excessive credit inquiries. Plaintiff was forced to pursue legal action to have the unauthorized inquiries removed.

**Pattern of Retaliatory Financial Suppression**

44. Plaintiff contends that the car dealership incident is part of a broader pattern of financial suppression initiated after she reported misconduct by the former Chapter 13 Trustee in 2019.

45. In 2019, Plaintiff obtained case files from her former attorney regarding her 2013 Chapter 13 bankruptcy proceedings. These files revealed evidence of collusion between the Trustee, the presiding judge, and her attorney, which Plaintiff believes undermined her bankruptcy case. Additionally, Plaintiff received a payment ledger from the Trustee's staff that, when compared to her records and a 2019 Proof of Claim submitted by her former mortgage servicer, revealed that $89,000 in payments made during her 2013 bankruptcy plan were neither disbursed to the mortgage servicer nor refunded to Plaintiff.

46. Plaintiff filed a notice of this discrepancy with the court in 2019. In June 2022, Plaintiff received a fraudulent Notice of Default (NOD), which she alleges was an act of intimidation and retaliation. The margins of the NOD contained repeated stamps of the former Trustee's name, despite the Trustee not being a party to the action and Plaintiff having been out of Chapter 13 bankruptcy for several years.

47. Plaintiff asserts that the former Trustee, leveraging his position within the Department of Justice (DOJ), retaliated against her by creating financial barriers, including the removal of her active credit trade lines prior to 2024 and the excessive credit inquiries at the car dealership in September 2024. Plaintiff contends that these actions were intended to impede her economic stability and business growth.

E. **Federal Suppression and "Virtual Prison" (2014-2025)**

48. After resuming her father's research in 2014, DOJ and Doe Defendants imposed a "virtual prison" on the Plaintiff, which included severe financial sabotage, professional harm, and judicial collusion.

**EIGHTH AMENDMENT CLAIM of Virtual Imprisonment**

**Legal Basis**

**Eighth Amendment Violations Through Pre-Crime Virtual Imprisonment**

49. Plaintiff alleges that Defendants—officials within the Department of Justice (DOJ), judicial system, government agencies, and contracted third parties, and compensated private individuals—imposed a systematic "virtual prison" upon Plaintiff without conviction, charge, or lawful basis, constituting cruel and unusual punishment in violation of the Eighth Amendment.

**This intensified in 2019, after two events occurred related to defendants:**

50. As mentioned in the Financial Suppression section above, Plaintiff received her attorneys file from her 2013-2015 Chapter 13 Bankruptcy, which included emails between a DOJ Bankruptcy Trustee, a Federal Bankruptcy Judge and her attorney. Her attorney had never shared this with her, and had left his position in the middle of the case. The emails showed illegal collusion to intentionally damage her case, directed by the Judge and Trustee, in the falsification of records. Later in 2019, she received the ledger of her 2013 case, and Proof of Claims from her former Mortgage Lender, (Bank of America/Rushmore), and saw these same defendants associated with the DOJ Trustees office, and the Federal Court, took over $89,000 in monthly payments from her but never paid the Mortgage Servicer or her Car Lender. Nor did they return the funds to her. Additionally they allowed the Mortgage Servicer to increase her monthly payments by 200% each month until her case failed. This 200% increase had no basis, and violated the terms of her mortgage. They took similar actions with her former house in Memphis TN. The bank sold the property for tens of thousands more than was owed on the property, and then illegally kept the overage. Additionally the bank allowed the property to be damaged. They also interfered with a sale, through intimidation. When researched it linked back to a high ranking officer in the Military.

51. Plaintiff reported new evidence to the U.S. Attorney she found in a Trial Document located in the National Archives, from a 1979 murder, of Border Agent Kenneth Ward, which implicated another agent involved in his murder, a possible use of the former kid in poverty recruited at age 14, (John Doe 2), as described in links to her fathers research, as a contracted killer in that murder, the presence of another off duty border agent who sat outside the customers house, who allowed the entrance of this kid, carrying a gun, to enter the customs house, where Ward was alone that day. And that ambulance reports showed two additional bullets appeared in Ward, after the former kid, left the scene. Additionally, that a shipment of illegal drugs worth billions of dollars, had arrived in a ship from Columbia, moored at a port on Vancouver Island, BC, was to cross the border, at the time Ward was killed, and Ward was not willing to look the other way.

   a. The Plaintiff had offered to give this evidence to US Attorney Duty Officer Angelica Williams, in the Seattle Federal Court House, and later faxed it to her the same day. It was faxed as Ms Williams had refused it, after initially agreeing to receive it. The plaintiff did not want to withhold evidence related to a murder.

52. **Selected actions by Defendants:**

- Redirected Plaintiff's phone calls and text messages, rendering contact with counsel, family, or community impossible.
- Wrote SMS messages to family and associates impersonating Plaintiff, creating strain and derision on relationships.
- Suspended or delayed access to voicemails for weeks after they were left, interfering with access to applying for work.
- Intimidated hiring managers or managers if hired, so they felt obliged to stop employment.
- Created Chaos or violence through smear campaigns on line, so managers of companies feared for the survival of their business unless they obliged with pressure.
- Fabricated debts or altered debts to economically enslave Plaintiff.

- Altered Plaintiff's credit report to perpetuate isolation and stigma and remove access to lending or business solutions; This included removing all trade lines of positive credit.

- Changing the balance of 30 year old Student loan, by increasing balance by 200%, in 2019, after Plaintiff reported evidence on death of Border Agent Kenneth Ward, in 1979, which she discovered during research in July 2019.

- Intimidated and put pressure on management and administrators at Social Security Retirement, so pre-approved applications to increase benefits were never processed or laid dormant for over three years and then published fraudulent letters.

- Pressured Senator Murray and Cantwell to they would help with the Social Security Fraud.

- Violations of constitutional rights of Plaintiff were detailed across 34 pages of constitutional claims, submitted to state and federal court cases, but Judges never adjudicated the issues, instead issued conclusory statements or one liners, like: "Denied".

- After two attempted vehicular assaults by unmarked black SUVs, in 2023, when ever Plaintiff tried to file something in court, she obtained a signed TPO, to physically protect herself and her dog. The events had been reported to police. The state court administrator and magistrates never processed the TPO, by submitting it to police as required by law. The plaintiff only learned the day prior to the hearing for a permanent Order. The state court administrator, Cornwall, then reached out to police, and told them not to process it, when she learned Plaintiff was going to bring it to them. The hearing was to be continued, but instead the state magistrate ordered the TPO restraints to all be removed, and then filed it with police. He did this when the Plaintiff was not at the hearing against state law on Protection Orders.

- State court administrator Cornwall, directed court staff to remove selected recorded hearings when Plaintiff spoke from the dockets of her cases,

- The administrator Cornwall, of the state court directed the clerk, to intentionally assign her civil complaint, regarding a fraudulent transfer of her title of her home of 24 years, to a Judge

who was on leave and could not address activity in the case for over a year. He never addressed it.

- Fraudulent documents were recorded as a trustee's deed so a fraudulent auction could be recorded transferring the title to her home, which has no valid mortgage and hundreds of thousands of dollars of equity. On November 17, they stated the title was transferred. But weeks later a senior title officer stated no sale had occurred. The Plaintiff filed the title fraud case in state court, in early December 2023. This is the case assigned to an absent judge.

- On December 20, 2023 a fraudulent 1099c was filed with the IRS in the plaintiffs IRS account, for the entire amount of the former mortgage, when there had been no legal mortgage since 2018. While at the same time this same party (Bank of America), claimed it was auctioned and sold, creating a fraudulent debt for the Plaintiff, which would financially suppress her for rest of her life. The retail value of the house at that time was $1.6mm. the former mortgage was $427,000. This was never allowed to be adjudicated in the federal or state court. Any filings were ignored and evidence not reviewed.

- The assessor for King County fraudulently transferred the title of the house, even though he knew there was a challenge to the title transfer in court, and had received a Lis Pendins, and a letter from the Plaintiff, against both state and federal laws. He also instructed a clerk to remove the history of ownership of her home from the recorders office. She was told it was merely an oversight.

- The Plaintiff still lives in her home. After the removal of the TPO, someone attempted to turn off the water from the street, on the coldest day of the year in January 2024, to cause property damage. The Plaintiff is 70 YO. She came home early from work, and found it. This was sabotage.

- On January 14, 2025, the Plaintiff suffered an injury near her right eye. Upon analysis she was told it was a mark from a heat-based weapon, which leaves a distinctive type of mark. This caused her to lose momentary consciousness. Normally, this could cause a deadly fall or severe injury. The timing of this would have benefited defendants, which will be explained later. This type of injury also occurred in June 2017. Only the Plaintiff suffered a concussion.

This was during key filing dates for her FOIA lawsuit against the FBI to obtain documents on

herself, from her interviews with them while she was at CMU, and on her father. The

concussion caused her to abandon the case.

Plaintiff contends this pre-crime scheme, rooted in predictive policing or profiling related to her

fathers research, and her experience at CMU, absent any criminal act, effectively punished Plaintiff in

a manner both cruel and unusual, triggering Eighth Amendment scrutiny.

## F. **Legal Framework**

53. The Eighth Amendment prohibits the federal government from imposing "cruel and unusual

punishments." U.S. Const. amend. VIII. While traditionally applied post-conviction, its protections

extend to punitive measures imposed by state actors that functionally deprive individuals of liberty

without due process. See Carlson v. Green, 446 U.S. 14, 19–20 (1980) (recognizing Eighth

Amendment liability for federal officials' deliberate indifference causing harm). Precedent

acknowledges that punishment need not follow formal conviction to offend the Constitution when its

effect is sufficiently severe and intentional. Cf. Ingraham v. Wright, 430 U.S. 651, 671 n.40 (1977)

(suggesting pre-conviction harms may implicate constitutional limits). Moreover, the Fifth

Amendment's Due Process Clause reinforces this protection, barring liberty deprivations without fair

hearing. U.S. Const. amend. V.

## G. **Application**

54. Defendants' actions constitute punishment under the Eighth Amendment. By severing Plaintiff's

access to courts (via redirected calls preventing counsel contact), financial autonomy (via fabricated

debts, credit tampering, IRS and insurance tampering), and societal ties (via communication and

community isolation), Defendants created a de facto confinement absent any adjudicated guilt. This

"virtual prison" mirrors traditional punishment's hallmarks—loss of freedom, stigma, and economic

ruin—yet evades due process entirely, as no crime was committed or charged. The scale and intent of

this scheme, executed by DOJ officials and judicial actors, reflect deliberate indifference akin to that

condemned in Carlson v. Green, where federal officials faced liability for constitutional harm. 446 U.S.

at 21. The fabrication of debt to "forever enslave" Plaintiff further marks this as "unusual," deviating

from any legitimate preventive aim and imposing a disproportionate, perpetual penalty.

55. The judicial failure to address 34 pages of documented violations compounds the injury. By ignoring Plaintiff's claims, Federal Judges Whitehall and Alston, (and others), and the State court Judge Holloway, and the use of the chief Administrator Cornwall in state court, to mis-assign the case to a Judge on leave, (and others), and changing the case dockets, removing audio recordings of hearings, and not processing her TPO, then gutting its restraints when she was not present, enabled Defendants' unchecked authority, effectively sanctioning a pre-crime type of punishment regime. This aligns with historical Eighth Amendment concerns—arbitrary state power reminiscent of preemptive English abuses—while breaching modern due process norms. See Rochin v. California, 342 U.S. 165, 172 (1952) (striking down state actions shocking the conscience). Defendants' reliance on opaque pre-crime mechanisms, potentially predictive algorithms, amplifies the cruelty, targeting Plaintiff not for acts but for unproven risk, a practice courts must scrutinize when it crosses into punishment.

C. **Injury**

56. Plaintiff suffered financial ruin, professional sabotage, physical injury, and loss of liberty, all without due process, directly resulting from Defendants' pre-crime punitive measures.


## RELIEF Requested

WHEREFORE, Plaintiff requests:

A. Compensatory and punitive damages against Chief Judge David G. Estudillo and John/Jane Does 1-10 in their individual capacities for constitutional violations under Bivens;

B. Injunctive relief against all Defendants in their official capacities, prohibiting further suppression, intimidation, and obstruction;

C. Compensatory damages for financial harm caused by Defendants' obstruction of justice;

D. Declaratory judgment that Defendants violated the Eighth, Fifth, and First Amendments, 5 U.S.C. § 552, and 42 U.S.C. § 1985(3).

E. Injunctive relief to end the "virtual prison," restore financial and property rights, enforce protective orders, remove fraudulent IRS 1099c, Restore title of her home to her, demand SSA provides accurate assessment of Divorced Spouse benefit, according to accounting provided by SSA is October 2022 which showed she was eligible, and pay back payments withheld since November 2022.

F. Compensation for damage to property, loss of income, and suffering for the nearly 30 years of being forced into a "virtual prison" in violation of my rights as stated above.

G. Costs, court fees, and other relief as the Court deems just.


## CASE Authorities

In Gonzalez v. Trevino, the U.S. Supreme Court reinforced the principle that government officials violate the First Amendment when they retaliate against individuals for engaging in protected speech. The Court's decision drew upon several key precedents and statutes:

1. First Amendment of the U.S. Constitution: This amendment prohibits government officials from subjecting individuals to retaliatory actions, including criminal prosecutions, for exercising their free speech rights.

2. 42 U.S.C. § 1983: This federal statute allows individuals to sue state officials in their personal capacities for violations of constitutional rights, providing a civil remedy against those who, under color of state law, infringe upon federally protected rights.

3. Mount Healthy City School District Board of Education v. Doyle (1977): In this case, the Supreme Court established a framework for First Amendment retaliation claims. A plaintiff must demonstrate that their protected speech was a substantial or motivating factor in the adverse action

taken against them. If successful, the burden shifts to the defendant to show that the same action would have been taken absent the protected conduct.

4. Nieves v. Bartlett (2019): This decision addressed retaliatory arrest claims, holding that the presence of probable cause generally defeats such claims. However, the Court recognized an exception: if a plaintiff presents objective evidence that others similarly situated, who were not engaged in protected speech, were not arrested, the claim may proceed despite the existence of probable cause.

In Gonzalez v. Trevino, the Supreme Court applied these principles, clarifying that plaintiffs alleging retaliatory arrest need not produce identical comparators to support their claims. Instead, they must provide objective evidence that their arrest occurred in circumstances where officers typically exercise discretion not to arrest. This decision underscores the judiciary's commitment to protecting individuals from governmental retaliation for exercising their constitutional rights.

In her lawsuit, Sylvia Gonzalez invoked 42 U.S.C. § 1983, a federal statute that permits individuals to sue state officials in their personal capacities for violations of constitutional rights. She alleged that her arrest was a retaliatory act in response to her protected speech, thereby infringing upon her First Amendment rights. The Supreme Court, in its decision, upheld the applicability of § 1983 in this context, allowing Gonzalez's claim to proceed.

The Court's ruling emphasized that plaintiffs alleging retaliatory arrest under § 1983 need not present "virtually identical and identifiable comparators" to support their claims. Instead, they must provide objective evidence indicating that their arrest occurred in circumstances where officers typically exercise discretion not to arrest. **This clarification ensures that individuals can seek redress when government officials misuse their authority to retaliate against protected speech.**

By upholding Gonzalez's use of § 1983, the **Supreme Court reinforced the statute's role as a vital tool for protecting constitutional rights against abuses by government officials.**

**The Eighth Amendment to the United States Constitution states:** "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Traditionally, its protections have been applied within the criminal justice system, specifically concerning the treatment of individuals who have been convicted of crimes. However, the emergence of "pre-crime" initiatives—strategies aimed at preventing crimes before they occur—raises questions about the amendment's applicability in these contexts.

**Applying the 8th Amendment:** Exploitation of the algorithmic environment to create extrajudicial "virtual prisons"

"Pre-crime" strategies, often referred to as predictive policing, utilize data analytics to forecast potential criminal activity and intervene before crimes are committed. These approaches have been implemented in various jurisdictions across the United States, including states like California, Washington, and Illinois. While the intention is to enhance public safety, concerns have been raised regarding civil liberties and potential overreach.

The Eighth Amendment's prohibition against "cruel and unusual punishments" has been interpreted by courts to apply primarily to post-conviction scenarios. For instance, the National Constitution Center notes that the amendment "prohibits the federal government from imposing unduly harsh penalties on criminal defendants, either as the price for obtaining pretrial release or as punishment for crime after conviction."

Given this traditional interpretation, applying the Eighth Amendment to pre-crime or even to the exploration of advanced technologies by government agencies and officers,  to create a "virtual prison" around an adversary  presents challenges. Since individuals targeted by predictive policing have not been convicted of a crime, the protections against "cruel and unusual punishments" may not directly apply. **However**, if pre-crime interventions or "Virtual Prisons" involve punitive measures that effectively restrict an individual's freedoms—such as virtual confinement through the suspension of financial services, lawyers, employment opportunities, communications, or media

access—there could be grounds to argue that **such actions constitute punishment without due process.**

Respectfully submitted,

Marta Lyall, Pro Se

1001 NW 175th ST
Shoreline, WA 98177
MartaL2025@protonmail.com

Dated: February 27, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2025, I filed notice of this and exhibits (if applicable), in all related cases, which notifies all parties.

Sincerely,
Marta Lyall, Pro Se